UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Stuart Lizotte, Jr.,

        Plaintiff,

            v.                                Civil Action No. 5:17–cv–27–gwc–jmc

Lisa Menard, Joshua Rutherford,
Jesse Rose, Dustin Mone, Mitchell Britton,

        Defendants.

## <u>REPORT AND RECOMMENDATION</u>
(Docs. 43, 44)

Plaintiff Stuart Lizotte, Jr., a prisoner proceeding *pro se*, brings this action under 42 U.S.C. § 1983, alleging that he was injured in an incident at Marble Valley Regional Correctional Facility (MVRCF) while he was in the custody of the Vermont Department of Corrections (DOC), in violation of his rights under the Eighth Amendment. (Doc. 6 at 3.) Lizotte names as Defendants former DOC Commissioner Lisa Menard;[1] MVRCF Superintendent Joshua Rutherford; and Correctional Officers (COs) Jesse Rose, Dustin Mone, and Mitchell Britton. (*Id.* at 1, 3.) Lizotte seeks an unspecified amount of monetary damages for the pain caused to him as a result of the incident and injunctive relief in the form of an order stating that he may no longer reside at MVRCF. (*Id.* at 3; *see* Doc. 17 at 1–2.)

---

[1] Since the filing of this suit, Lisa Menard was succeeded as Commissioner of the DOC by Mike Touchette, who is automatically substituted as a party under Fed. R. Civ. P. 25(d).

Defendants have filed a Motion for Summary Judgment under Federal Rule of Civil Procedure 56, asserting that there are no disputed issues of material fact and they are entitled to judgment as a matter of law. (Doc. 44; *see also* Doc. 47.) Specifically, Defendants argue as follows: (1) Lizotte failed to exhaust his administrative remedies, as he did not properly present his claim through the applicable grievance procedure before filing suit (Doc. 44 at 3–9); (2) Lizotte does not allege facts showing that Defendants Menard and Rutherford were personally involved in any of the alleged unlawful conduct (*id.* at 9–10); (3) Lizotte's claims against Defendants in their official capacity are barred by 42 U.S.C. § 1983 and Vermont's doctrine of sovereign immunity (*id.* at 11–13); (4) Lizotte's Eighth Amendment claim of excessive use of force does not state a cognizable constitutional claim, as there is no evidence that Defendants acted in a sadistic or malicious manner to cause harm to Lizotte, and the harm caused to Lizotte was not harmful enough or sufficiently serious to reach constitutional magnitude (*id.* at 13–16); and (5) if Lizotte asserts a claim for punitive damages, the claim fails, as there are no allegations that Defendants' conduct was motivated by an evil motive or intent[2] (*id.* at 16–17). As required by Local Rule 56(a) and (e), Defendants filed a Statement of Undisputed Material Facts (Doc. 47) and informed Lizotte of the consequences if he failed to file a responsive statement of disputed material facts with attached documentary evidence (Doc. 46). Lizotte has not responded to Defendants' Motion

---

[2] This argument is not considered, given that Lizotte has not pled a claim for punitive damages in his Complaint. Even if he had, Lizotte's claim would fail for the reasons stated herein.

and has not filed a statement of disputed material facts or other documentary evidence as required by Local Rule 56(b).

For the reasons stated below, I recommend that Defendants' Motion for Summary Judgment (Doc. 44; *see also* Doc. 47) be GRANTED and Lizotte's claims be DISMISSED.

## Background Facts and Procedure[3]

On December 28, 2016, Lizotte notified correctional officers at MVRCF that he did not feel safe residing in the General Population Unit at the facility and preferred to return to the Restrictive Housing Unit. (Doc. 6 at 3.) When CO Rose ordered Lizotte to lock into his living unit, Lizotte refused. (*Id.*; Docs. 47 at 2, ¶ 7; 47-1 at 2.) Rose tried to close the living unit door, but Lizotte pulled back on the door and placed his foot in the doorway to prevent the door from closing. (Docs. 47 at 2, ¶¶ 9–10; 47-1 at 2.) CO Britton observed the situation, and joined Rose in attempting to secure the living unit door, ultimately applying a front kick to the door and entering the unit. (Docs. 47 at 2, ¶¶ 11, 13; 47-1 at 2.) As Lizotte struggled with the officers, refusing to submit despite orders to do so, Rose and Britton brought Lizotte to the ground, at which time Lizotte stopped resisting and became compliant. (Docs. 47 at 2, ¶ 14; 47-1 at 2.) CO Mone also observed the scene, eventually moving into the unit to direct the other two inmates in the cell to stand back and away from the incident, and to assist COs Rose and Britton in gaining control of Lizotte. (Docs. 47 at 3, ¶¶ 15–16; 47-1 at 1.) During the scuffle at

---

[3] The facts summarized here are predominantly drawn from Lizotte's Complaint (Doc. 6), and Defendants' Statement of Undisputed Material Facts (Doc. 47) and the documents attached thereto (Docs. 47-1 through 47-5). They are undisputed unless otherwise indicated.

the door, Lizotte's foot "slammed in the door jam," allegedly causing Lizotte pain, bruising on his ankle, and limited movement. (Doc. 6 at 3.) Once the conflict subsided, Lizotte was handcuffed and escorted to the segregation unit without incident. (Docs. 47 at 3, ¶ 17; 47-1 at 1–2.)

Immediately thereafter, Registered Nurse Donna Bedard assessed Lizotte, noting that he had a bruise on his left arm, and some tenderness and swelling of his left foot. (Docs. 47 at 3, ¶ 18; 47-2.) Nurse Bedard further noted that Lizotte had no obvious deformities; his weight-bearing ability was only minimally impacted; and he could be treated with ice. (Docs. 47 at 3, ¶ 19; 47-2.)

On the same date, Lizotte filed a complaint regarding the incident using the DOC's "Informal Complaint & Plan for Resolution Form." (Docs. 47 at 4, ¶ 27; 47-5.) Two days later, on December 30, 2016, a response to the complaint was delivered to Lizotte. (Docs. 47 at 4, ¶ 27; 47-3 at 2, ¶ 11; 47-5.) The response stated: "This has been referred to the VSP [(the Vermont State Police)]." (Doc. 47-5.) Lizotte did not file any additional DOC grievance paperwork regarding the incident and thus did not complete the DOC grievance appeal process. (Doc. 47-3 at 2, ¶¶ 12–13; *see* Doc. 47-4.)

Approximately two months later, on February 22, 2017, Lizotte filed the Complaint in this action. (Doc. 6.) Defendants timely filed their Answer, asserting affirmative defenses pursuant to Federal Rule of Civil Procedure 12, including failure to state a claim upon which relief can be granted, failure to exhaust remedies, and improper venue. (Doc. 16.) Soon thereafter, Lizotte filed a "Motion for Clarification o[f] Defendants['] Answer," wherein he reiterated his claims and

challenged the validity of Defendants' affirmative defenses.  (Doc. 17.)  The Court denied Lizotte's Motion without prejudice, finding that Lizotte was not entitled to the requested "clarification" and that, in any event, the Motion was premature given that discovery had not begun.  (Doc. 18.)  On August 25, 2017, a Stipulated Discovery Schedule/Order was filed, indicating that discovery would be closed by April 16, 2018.  (Doc. 22 at 1, ¶ 8.)

On September 18, 2018, Lizotte filed a motion titled "Motion for Assistance," wherein he advised that he had been moved to a housing unit in Pennsylvania, and had been placed in segregation since arriving there.  (Doc. 43.)  Lizotte requested that he be returned to a Vermont correctional facility so that he could "adequately present [his] case and . . . file any objections in [a] timely manner[]."  (*Id.*) Defendants have not responded to that Motion.  Finally, on October 17, 2018, Lizotte filed a notice advising that he again had been moved, this time to a correctional facility in Mississippi, and that his "legal document[s] pertaining to [this case]" had been "lost" during his transport from Pennsylvania.  (Doc. 48.)

## Analysis

Lizotte brings this action under 42 U.S.C. § 1983, which provides a civil claim for damages against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ."  42 U.S.C. § 1983.  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence

5

fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). To succeed on a § 1983 claim, a plaintiff must establish that: "(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).

## I.    Summary Judgment Standard

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, "[t]he moving party is entitled to summary judgment where 'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor' on an essential element of a claim on which the plaintiff bears the burden of proof." *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 22 (2d Cir. 2012) (quoting *In re Omnicom Grp., Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)).

In considering a summary judgment motion, the court is "required to resolve all ambiguities and draw all factual inferences in favor of the nonmovant." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted). If the moving party demonstrates that there are no genuine issues of material fact, the burden then shifts to the nonmoving party, who must present "'significantly probative supporting evidence' of a disputed fact."

6

*Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  He "cannot defeat summary judgment by relying on the allegations in his complaint, conclusory statements, or mere assertions that affidavits supporting the motion are not credible."  *Hamlett*, 496 F. Supp. 2d at 328 (citing *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *see also Dasher v. N.Y.C. Police Dep't*, No. 94 CV 3847(SJ), 1999 WL 184118, at *1 (E.D.N.Y. Mar. 18, 1999) ("[T]he court should grant summary judgment where the nonmoving party's evidence is merely colorable, conclusory, speculative, or not significantly probative.").

Because Lizotte is proceeding *pro se*, in addition to resolving all ambiguities and drawing all factual inferences in his favor, the court also "must interpret his papers liberally 'to raise the strongest arguments that they suggest.'"  *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).  Still, *pro se* litigants like Lizotte must meet the "usual requirements of summary judgment, and a *pro se* party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."  *Crenshaw v. Herbert*, 445 F. Supp. 2d 301, 303 (W.D.N.Y. 2006) (quoting *Hernandez v. McGinnis*, 272 F. Supp. 2d 223, 226 (W.D.N.Y. 2003)); *see also Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) ("[M]ere conclusory allegations, speculation[,] or conjecture will not avail a party

resisting summary judgment." (first alteration in original) (quoting *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996))).

## II.     Exhaustion

Defendants first argue that Lizotte's claim is barred because he failed to exhaust his administrative remedies, meaning he failed to properly present his claim through the applicable prison grievance procedure before filing suit.  (*See* Doc. 44 at 3–9.)

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility *until such administrative remedies as are available are exhausted*."  42 U.S.C. § 1997e(a) (emphasis added); *see Hernández v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009).  The requirement that a prisoner must exhaust his administrative remedies is "mandatory" and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes."  *Hernández*, 582 F.3d at 305 (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)).  The PLRA requires that exhaustion must be "proper," meaning it must "compl[y] with an agency's deadlines and other critical procedural rules."  *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).  In other words, inmates must adhere to the particular grievance procedures set out by the institution where they are incarcerated, which procedures "will vary from system to system and claim to claim."  *Jones v. Bock*, 549 U.S. 199, 218 (2007) ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").  Claims that have not been exhausted through the applicable

administrative grievance procedure "may not be pursued in federal court," *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011), and the district court does not have discretion to relieve a litigant from that requirement of the PLRA, *Booth v. Churner*, 532 U.S. 731, 739 (2001).

Lizotte states in his Complaint that MVRCF has a grievance procedure, and that he followed that procedure by filing a grievance regarding the incident at issue in this suit. (Doc. 6 at 2.) Lizotte did in fact timely file a written informal complaint on the proper grievance form regarding the subject incident (and the DOC properly responded to that complaint). (Docs. 47-3 at 2, ¶¶ 10–11, 47-5.) However, Lizotte neglected to thereafter follow MVRCF's formal grievance procedures prior to filing this action. (Doc. 47-3 at 2, ¶¶ 12–13.)

The applicable DOC administrative grievance procedure is set forth in Directive 320.01, as explained in the Affidavit of David Turner, the DOC's Grievance Coordinator. (*See* Doc. 47-3 at 1, ¶ 2; Doc. 47-4, State of Vt. Agency of Human Servs. DOC Directive # 320.01, *Offender Grievance Sys. for Field & Facilities* (effective 1/1/07).) Directive 320.01 states that, in order to initiate the grievance process, an inmate must voice his verbal complaint or file a written complaint immediately after and not to exceed ten business days after the event or discovery of the cause of the complaint. (Docs. 47-3 at 1, ¶ 3; 47-4 at 6–7, ¶ 7(a)(i).) As noted above, Lizotte complied with that procedure, effectively initiating the grievance process. (Docs. 47-3 at 2, ¶ 10; 47-5.) The Directive further provides, however, that if a plan to resolve the grievance is not agreed upon within 48 hours, the inmate may initiate the *formal* grievance process by delivering to a DOC staff

member a completed Offender/Inmate Grievance Submission Form. (Docs. 47-3 at 1, ¶¶ 3–4; 47-4 at 7, ¶ 7(a)(vi), 10, ¶ 10(a)(vi).) It is this procedure that Lizotte neglected to complete, as well as any procedures that might have followed it.[4]

Prior to 2016, if a *pro se* inmate like Lizotte had failed to exhaust his administrative remedies, the Second Circuit urged courts to consider "whether special circumstances existed that justified [the inmate's] failure to exhaust remedies that were available and not subject to estoppel." *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (discussing *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004)). In 2016, however, the Supreme Court in *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016), rejected the "special circumstances" exception, deeming it "a thing of the past" and holding that the exhaustion analysis hinges on the functional availability of administrative remedies. The court explained in *Ross* that, although a remedy exists in writing, it is considered functionally unavailable if: (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) the "administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60.

---

[4] As explained in Turner's Affidavit, Directive 320.01 provides that, after reviewing the inmate's formal grievance, the DOC staff member must propose a resolution to the inmate's grievance; if the inmate is dissatisfied with that proposal, he may appeal to the facility superintendent, who then may support, modify, or reject the resolution. (Doc. 47-3 at 1, ¶¶ 4–5.) If the inmate is dissatisfied with the superintendent's proposed resolution, he may appeal to the appropriate Corrections' Executive, who then may support, modify, or reject the appeal. (*Id.* at 1, ¶¶ 5–6.) If the inmate it dissatisfied with the Corrections' Executive's response, he may appeal to the Commissioner. (*Id.* at 1, ¶ 6.)

Applied here, there is no evidence that the applicable administrative remedies were functionally unavailable to Lizotte. Specifically, Lizotte does not allege that the grievance procedure described in Directive 320.01 operated as a "dead end" or was so "opaque" that it was practically useless. There does, however, appear to be evidence that the DOC misled Lizotte in such a way that he was prevented from exhausting his remedies. In his Complaint—which Lizotte filed on February 22, 2017, approximately two months after the subject incident occurred— Lizotte alleges that MVRCF "was suppose[d] to call Vermont State Police[, but that] never occurred." (Doc. 6 at 2.) Likewise, in his "Motion for Clarification o[f] Defendants['] Answer"—which Lizotte filed on June 7, 2017, a little over five months after the incident occurred—Lizotte states that he "was notified by the Chief of Security [at MVRCF] . . . that the Vermont State Police (VSP) would be contacted so that [he] could pursue criminal charges," and that Lizotte "has yet to have the chance to talk with said law enforcement." (Doc. 17 at 2.) Reading these allegations liberally in favor of Lizotte, they claim that the DOC misrepresented the status of Lizotte's grievance, resulting in Lizotte's failure to pursue it as he waited for a response from the VSP. The claim is supported by the statement of Robert Webster, a DOC Correctional Staff member, on Lizotte's "Informal Complaint & Plan for Resolution Form." (Doc. 47-5.) Next to "Plan for Resolution" (regarding Lizotte's complaint), Webster wrote: "This has been referred to the VSP." (*Id.*)

This response indicates neither a proposed "resolution" to Lizotte's informal complaint nor "[a]n identifiable, written solution or plan to resolve" it, as

contemplated by Directive 320.01.  (*See* Doc. 47-4 at 7, ¶ 7(a)(ii), (v).)  The DOC's

response does not indicate that Lizotte's complaint was being denied or sustained; it

merely advises Lizotte that his complaint had been "referred" to the VSP.  A similar

response was considered in *Jackson v. Cook Cty. Sheriff Thomas Dart*, Case No. 13-

CV-7713, 2016 WL 5390954, at *3 (N.D. Ill. Sept. 27, 2016), and the court found

that it was inadequate to support a claim of nonexhaustion.  The response in

*Jackson* stated that the inmate's complaint "has been directed to OPR [(the Office of

Professional Review)] for review and/or investigation."  *Id.*  The court explained:

> It defies common sense to read that response as negative action on [the
> plaintiff's] grievance, such that an appeal was appropriate.  Rather, the
> absence of any decision on [the] grievance coupled with a referral to OPR
> sounds like officials at the jail are taking [the] grievance seriously, not
> denying it (they never said they were denying it) but looking into it
> further.
>
> The Supreme Court has recently ruled that in some
> circumstances, it is unclear whether, while such an investigation is
> pending, the normal grievance appeal process is even available.  *See
> Ross v. Blake*, 136 S. Ct. 1850, 1860 (2016). . . .  [R]egardless of whether
> [the plaintiff] *could* have appealed while the OPR investigation was
> pending, it is hard to imagine *why* he would have appealed.  He was not
> told his grievance was being denied.  Rather, he was told that his
> grievance was being referred to an authoritative body for review and
> investigation.  Waiting for the results of the OPR investigation was a
> perfectly sensible thing to do.
>
> . . . .
>
> Granted, it is possible to read the response form as at least
> suggesting the necessity of an appeal despite the referral to OPR; the
> form's printed portion states, "[T]o exhaust administrative remedies,
> appeals must be made within 14 days of the date the inmate received
> the response."  But the more natural way of reading the form—the way
> the court would read the form were it in [the plaintiff's] position—is that
> no decision has been made on [the plaintiff's] grievance, as it is being
> referred to another body for investigation and review.  Indeed, [the
> plaintiff] points out (and as was indicated above) that the grievance

> "response" was not a response at all, because forwarding the grievance to another department for investigation of the allegations does not resolve the matter as "sustained" or not "sustained."

*Id.* at *3–4 (citations omitted); *see also Banschbach v. MSP Corr. Officer Carl Beckwith*, CV 15–106–H–DLC–JTJ, 2016 WL 5818494, at *3 n.2 (D. Mont., Oct. 5, 2016) (finding no failure to exhaust where response stated grievance is being "reviewed and investigated as necessary" and where it was unclear if the investigation was ever completed or disclosed to plaintiff, and explaining that "this back-and-forth grievance process makes it particularly 'unavailable' for a prisoner to understand the Inmate Grievance Program").

Defendants do not address this issue in their Motion, despite it being their burden to prove Lizotte's failure to exhaust.  *See Williams*, 829 F.3d at 126 n.6 ("[D]efendants bear the initial burden of establishing the affirmative defense of non-exhaustion.").  Therefore, I recommend that Defendants' Motion for Summary Judgment be DENIED insofar as it seeks dismissal based on Lizotte's failure to exhaust his administrative remedies.

## III.    Personal Involvement of Defendants Menard and Rutherford

Next, Defendants contend that Lizotte's claims against Defendants Menard and Rutherford should be dismissed because Lizotte does not allege facts to show that either Defendant was personally involved in any of the alleged unlawful conduct.  (*See* Doc. 44 at 9–10.)

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town*

13

*of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  Here, Lizotte presumably has

included Commissioner Menard and Superintendent Rutherford as Defendants in

this action because of their respective roles as supervisors at MVRCF when the

subject incident occurred.  However, Lizotte's claims must show some level of

personal responsibility: supervisor liability in a § 1983 action cannot rest merely on

a theory of respondeat superior.  *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir.

2003).  Moreover, mere "linkage in the prison chain of command" is insufficient to

implicate a state commissioner of corrections in a § 1983 claim.  *Ayers v. Coughlin*,

780 F.2d 205, 210 (2d Cir. 1985); *see also Wright*, 21 F.3d at 501 (noting that a

defendant in a § 1983 action may not be held liable for constitutional violations

merely because he held a high position of authority).

A supervisor may be held liable for unconstitutional conduct only in certain

limited circumstances.  The Second Circuit explained:

> The liability of a supervisor under § 1983 can be shown in one or more
> of the following ways: (1) actual direct participation in the constitutional
> violation, (2) failure to remedy a wrong after being informed through a
> report or appeal, (3) creation of a policy or custom that sanctioned
> conduct amounting to a constitutional violation, or allowing such a
> policy or custom to continue, (4) grossly negligent supervision of
> subordinates who committed a violation, or (5) failure to act on
> information indicating that unconstitutional acts were occurring.

*Hernandez*, 341 F.3d at 145 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.

1995)).  Lizotte does not claim that Menard or Rutherford had any personal

involvement in the incident underlying his claims, or that these Defendants

personally knew or had reason to know about either the incident or Lizotte's

complaint about the incident.  Nor does Lizotte claim that Menard or Rutherford

helped create a policy or custom that sanctioned the incident or allowed such a policy or custom to continue. Lizotte also does not claim that Menard or Rutherford was grossly negligent in their supervision of the other Defendants. And finally, there is no suggestion that Menard or Rutherford failed to act on information indicating that unconstitutional acts had occurred.

Rather, the Complaint merely references Menard and Rutherford in its caption and in the section entitled "Parties," indicating only that Menard was the Commissioner of the DOC and Rutherford was the Superintendent at MVRCF when the subject incident occurred. (Doc. 6 at 1–3.) Neither Menard nor Rutherford is mentioned in the text of the Complaint. Even if Lizotte had alleged that one or both of these Defendants saw and considered Lizotte's completed Informal Complaint & Plan for Resolution Form, "[t]he mere receipt of a letter, complaint[,] or grievance from an inmate is insufficient to establish a claim of personal involvement by a correctional supervisor." *Islam v. Fischer*, No. 07 Civ. 3225(PKC), 2008 WL 110244, at *3 (S.D.N.Y. Jan. 9, 2008); *see Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) (collecting cases holding that ignoring prisoners' letters of protest and requests for investigation is insufficient to premise § 1983 liability); *see also Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) (holding allegation that prison superintendent had general responsibility over inmate "care, custody[,] and safety" was insufficient for § 1983 liability, and stating: "[d]ismissal of a section 1983 claim is proper where, as here, the plaintiff 'does no more than allege that [defendant] was in charge of the prison'" (second alteration in original) (quoting *Williams v. Vincent*, 508 F.2d 541, 546 (2d Cir. 1974))).

15

I therefore recommend that Defendants' Motion for Summary Judgment be
GRANTED with respect to Defendants Menard and Rutherford on the basis of
Lizotte's failure to allege their personal involvement in unconstitutional conduct.

## IV.    Official-Capacity Immunity

Next, Defendants argue that Lizotte's claims against them for monetary
damages in their official capacities are barred by § 1983 and Vermont's doctrine of
sovereign immunity.  (*See* Doc. 44 at 11–13.)  The Eleventh Amendment generally
prohibits plaintiffs from recovering damages from state officials in their official
capacities.  *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (stating claim for
damages against state officials in their official capacity is considered a claim
against the state and is thus barred by the Eleventh Amendment); *Pennhurst State
Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, (1984) (noting agencies and
departments of the state are entitled to assert the state's Eleventh Amendment
immunity); *Darcy v. Lippman*, 356 F. App'x 434, 436–37 (2d Cir. 2009) ("The
Eleventh Amendment . . . bars [plaintiff] from pursuing a claim for damages against
the individual defendants in their official capacities."); *Davis v. New York*, 316 F.3d
93, 101 (2d Cir. 2002) (collecting cases).  Exceptions to this general rule apply when
there has been an explicit and unequivocal waiver of immunity by a state, or a
similarly clear abrogation of the immunity by Congress.  *See Graham*, 473 U.S.
at 169; *Pennhurst*, 465 U.S. at 99.

The State of Vermont has not waived its Eleventh Amendment sovereign
immunity.  In fact, the Vermont Legislature has specifically preserved the State's
immunity under that Amendment.  *See* 12 V.S.A. § 5601(g) (Vermont Tort Claims

Act reserves Eleventh Amendment immunity for all claims not specifically waived).

It is also well settled that Congress did not abrogate state sovereign immunity by

enacting § 1983. *See Quern v. Jordan*, 440 U.S. 332, 340–42 (1979). Accordingly, I

recommend that Defendants' Motion for Summary Judgment be GRANTED with

respect to Lizotte's claims for money damages against Defendants in their official

capacities.

## V.     Eighth Amendment Claim

Finally, Defendants address Lizotte's substantive claim of excessive use of

force in violation of the Eighth Amendment (*see* Doc. 6 at 3), asserting that Lizotte

does not state a cognizable constitutional claim, as there is no evidence that

Defendants acted in a sadistic or malicious manner to cause harm to Lizotte, or that

the harm caused to Lizotte was harmful enough or sufficiently serious to reach

constitutional dimension (*see* Doc. 44 at 13–16).

"A claim of cruel and unusual punishment in violation of the Eighth

Amendment has two components—one subjective, focusing on the defendant's

motive for his conduct, and the other objective, focusing on the conduct's effect."

*Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009). In order to prove an Eighth

Amendment violation, a plaintiff must demonstrate each of the following two

elements by a preponderance of the evidence: (1) the defendant used force against

the plaintiff maliciously and sadistically, for the purpose of causing the plaintiff

harm; and (2) the plaintiff suffered some harm as a result of the defendant's use of

force. *Hudson v. McMillian*, 503 U.S. 1, 7–8 (1992). To meet the first element—

which is considered a subjective inquiry into the defendant's state of mind at the

time of the incident—the plaintiff must show that the defendant had "the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Goord*, 554 F.3d at 268 (internal quotation marks omitted). Whether the use of force against an inmate is unnecessary or wanton depends on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* (quoting *Hudson*, 503 U.S. at 7).

Courts consider the following factors when determining whether prison officials unnecessarily and wantonly inflicted pain on an inmate: "the extent of the plaintiff's injuries; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (citing *Hudson*, 503 U.S. at 7). If, after evaluating these factors, the trier of fact finds that the defendants acted maliciously, then wantonness has been established and an Eighth Amendment violation has occurred. *Id.* "If, on the other hand, reflection upon these factors leads the jury to find that the defendants acted in a good-faith effort to maintain and restore discipline, no constitutional violation has occurred because the subjective component of the claim has not been satisfied." *Id.*

Prison administrators receive "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley v. Albers*, 475 U.S. 312, 321–22 (1986) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547

(1979)). This deference "extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline." *Id.* at 322. And although such deference "does not insulate from review actions taken in bad faith and for no legitimate purpose, . . . it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Id.*; *see Kalwasinski v. Artuz*, No. 02 CV 2582(LBS), 2003 WL 22973420, at \*4 (S.D.N.Y. Dec. 18, 2003) ("[P]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (internal quotation marks omitted)).

Furthermore, "[t]he infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319. And "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Hernandez v. Jones*, No. 06 CV 3738 ARR, 2006 WL 3335091, at \*2 (E.D.N.Y. Oct. 10, 2006) (quoting *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999)). Therefore, in order for an Eighth Amendment excessive use of force claim to survive a motion for summary judgment, the evidence, viewed in the light most favorable to the nonmoving party, must go "beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior

19

alternatives," and instead must "support a reliable inference of wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322.

These principles were applied in *Kalwasinski v. Artuz*, 2003 WL 22973420, a case involving facts similar to those at issue here. In *Kalwasinski*, a prison guard had ordered the plaintiff inmate to move closer to the man in front of him in a line, and the plaintiff refused. *Id.* at *1. The guard then pushed the plaintiff against a wall, and the plaintiff forced the guard to the ground and pinned him there. *Id.* Other guards then lifted the plaintiff off the first guard and threw the plaintiff headfirst into another room, causing the plaintiff's head to strike a wall and a bench, resulting in the plaintiff suffering a bump to the head, scratches, bruises, and abrasions. *Id.* at *1, 4. The court granted summary judgment to the defendants, finding that the plaintiff's injuries "may be described, at most, as minor," and that the "the amount and type of force used correspond[ed] to that necessary to remove a threat to both [the guard's] person and prison security [generally]." *Id.* at *5. Similarly, in *Beckwith v. Hart*, 263 F. Supp. 2d 1018, 1023–24 (D. Md. 2003), the court found no Eighth Amendment excessive force violation, where the plaintiff inmate allegedly sustained injuries as a result of the placement of his foot in a door to prevent a prison employee from shutting that door. The court noted that prison medical staff who examined the inmate after the incident confirmed that he sustained no injuries, and stated: "Not every push or shove . . . violates a prisoner's constitutional rights." *Id.* at 1024 (omission in original) (quoting *Hudson*, 503 U.S. at 9). *See Arnold v. Westchester Cty.*, No. 09 Civ. 3727(JSR)(GWG), 2012 WL 336129, at *7 (S.D.N.Y. Feb. 3, 2012) (finding that

plaintiff's "forced fall," which was allegedly caused by officers making the plaintiff walk quickly down a hallway while wearing leg restraints on his feet, did not amount to an Eighth Amendment violation, because the fall merely caused plaintiff "some pain and discomfort"); *Hernandez*, 2006 WL 3335091, at *2 ("Although it is not required that the inmate suffered significant injury to prevail on an Eighth Amendment claim, 'not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" (citation omitted) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973))).

In this case as well, Lizotte's Eighth Amendment excessive force claim fails. First, Lizotte's objective injuries were minimal.  Nurse Bedard recorded on the date of the incident that Lizotte had "upper left arm bruising without open wounds" in an area approximately two inches long and one inch wide.  (Doc. 47-2.)  The Nurse further noted that Lizotte had "upper left foot tenderness with slight swelling," and that the only treatment required was "ice as needed."  (*Id.*)  Other than Lizotte's own imprecise and self-serving statements, there is no indication that Lizotte suffered any injuries beyond these.  In his Complaint, Lizotte alleges that he suffered "unwanted pain," "bruising," and "limited movement" as a result of the incident.  (Doc. 6 at 3.)  Viewing the evidence in the light most favorable to Lizotte, it is clear that his injuries from the subject incident were minor.

But because even minor injuries can constitute an Eighth Amendment violation, *see Hudson*, 503 U.S. at 7; *Romaine v. Rawson*, 140 F. Supp. 2d 204 (N.D.N.Y. 2001) (holding that when all parties admit that force was unnecessary, even a *de minimus* use of force violates the Eighth Amendment), the court must

21

consider whether Defendants used force against Lizotte "maliciously and sadistically for the very purpose of causing harm" to Lizotte, *Hudson*, 503 U.S. at 6 (internal quotation marks omitted), or rather, "in a good-faith effort to maintain or restore discipline," *Goord*, 554 F.3d at 268 (internal quotation marks omitted). Particularly relevant to this inquiry, the incident initially arose because Lizotte—in his own words—"refused to lock[] in[to his living unit]" when he was ordered to do so by CO Rose (Doc. 6 at 3), and because Lizotte placed his foot between the door and the door jamb to prevent the door's closure (Doc. 47-1 at 2). Rose attempted to gain Lizotte's compliance by "using Advanced Communications Skills," including advising Lizotte that he would "be sprayed if he did not move" and giving Lizotte "multiple opportunities to comply." (Doc. 47-1 at 2.) It was only after these efforts failed that COs Rose, Britton, and Mone used limited force on Lizotte in an attempt to gain his compliance. This force included: Rose engaging in a tug-of-war action with Lizotte over the unit door, Britton kicking the door, Mone engaging Lizotte's right arm in a rear wrist lock, and Rose and Britton taking Lizotte to the ground and handcuffing him. (*Id.* at 1–2; Doc. 47 at 2–3, ¶¶ 9–17.) There is no evidence that any of these actions was committed maliciously or sadistically for the purpose of causing harm to Lizotte; rather, the evidence indicates that the COs acted together to gain control over a disobedient inmate and restore order at MVRCF.

A reasonable factfinder would conclude that there was a need for the COs to apply force in this situation, and courts have consistently held that using force on a prisoner does not violate his constitutional rights if done, as here, to maintain institutional security. *See, e.g.*, *Whitley*, 475 U.S. at 322; *Hudson*, 503 U.S. at 7;

*Goord*, 554 F.3d at 268; *Kalwasinski*, 2003 WL 22973420, at *4; *Hernandez*, 2006 WL 3335091, at *2 (finding no Eighth Amendment violation where, in the course of breaking up a prison fight, a guard allegedly sprayed pepper spray on an inmate and threw him to the ground, causing a head injury); *Kee v. Hasty*, No. 01 Civ.2123(KMW)(DF), 2004 WL 807071, at *12 (S.D.N.Y. Apr. 14, 2004) ("Where a prison disturbance was in progress at the time of the alleged constitutional violation, wide-ranging deference must be accorded to the actions of the prison officials in quelling the disturbance." (internal quotation marks omitted)). Moreover, the amount of force used by COs Rose, Britton, and Mone was proportional to the threat posed by Lizotte. Based on his actions, it was clear that Lizotte was not going to comply with the order to lock into his living unit. Had the COs not acted to gain control over Lizotte (and the living unit door that Lizotte was holding open), Lizotte and his two cellmates could have escaped from the unit. Finally, the COs used force only for as long as necessary, stopping once Lizotte was on the ground, and assisting Lizotte to his feet after he was handcuffed and submissive. (*See* Doc. 47-1 at 1–2.)

After reviewing the relevant factors, and looking at the evidence in the light most favorable to Lizotte, I conclude that no reasonable trier of fact could find that Defendants violated Lizotte's Eighth Amendment rights. I therefore recommend that Defendants' Motion for Summary Judgment be GRANTED on this ground.

## VI.    Leave to Amend

In general, district courts should not dismiss *pro se* complaints with prejudice without granting leave to amend at least once, "when a liberal reading of the

complaint gives any indication that a valid claim might be stated." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) (quoting *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). It is well settled, however, that "leave to amend a complaint need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (holding that a "futile request to replead," even by a *pro se* litigant, "should be denied"). Amendment is futile when the cause of action is substantively flawed and better pleading will not cure its defects. *Cuoco*, 222 F.3d at 112; *see also Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990).

Amendment of Lizotte's claims against Defendants would be futile for the reasons explained above. I therefore recommend that the Court decline to grant Lizotte leave to amend.

## Conclusion

For these reasons, I recommend that the Court GRANT Defendants' Motion for Summary Judgment (Doc. 44; *see also* Doc. 47) and DISMISS Lizotte's claims with prejudice. Given this recommendation, I further recommend that the Court DENY Lizotte's "Motion for Assistance" (Doc. 43) as MOOT.

Dated at Burlington, in the District of Vermont, this 25th day of January 2019.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).